UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JSC FOREIGN ECONOMIC ASSOCIATION    :
TECHNOSTROYEXPORT,
    :

          Plaintiff,                       03 Civ. 5562 (JGK) (AJP)

    :

          -against-         :       **CERTIFICATION OF FACTS FOR**

    :     **CONTEMPT PURSUANT TO 28 U.S.C.**
INTERNATIONAL DEVELOPMENT AND        **§ 636(e)**
TRADE SERVICES, INC., et al.,    :

          Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Chief Magistrate Judge:**

**To the Honorable John G. Koeltl, United States District Judge:**

        In response to Judge Koeltl's March 31, 2005 Order, this will constitute written certification of the facts supporting an order of contempt of defendant Brigitte Jossem for failing to comply with this Court's October 7, 2004 Order. Pursuant to 28 U.S.C. § 636(e)(6), Ms. Jossem is ordered to appear before Judge Koeltl, at a date and time to be set by Judge Koeltl's chambers, to show cause why she should not be adjudged in contempt by reason of the facts certified herein.

        28 U.S.C. § 636(e)(6) (B) provides:

Upon the commission of any such act – . . . .

(B) in any other case or proceeding under subsection (a) or (b) of this section [636], or any other statute, where –

(i) the act committed in the magistrate judge's presence may, in the opinion of the magistrate judge, constitute a serious criminal contempt punishable by penalties exceeding those set forth in paragraph (5) of this subsection,

(ii) the act that constitutes a criminal contempt occurs outside the presence of the magistrate judge, or

(iii) the act constitutes a civil contempt,

the magistrate judge shall forthwith certify the facts to a district judge and may serve or cause to be served, upon any person whose behavior is brought into question under this paragraph, an order requiring such person to appear before a district judge upon a day certain to show cause why that person should not be adjudged in contempt by reason of the facts so certified. The district judge shall thereupon hear the evidence as to the act or conduct complained of and, if it is such as to warrant punishment, punish such person in the same manner and to the same extent as for a contempt committed before a district judge.

## FACTS

The facts surrounding this action by JSC to collect an over $200 million judgment against defendant IDTS spell out an evasive game played by defendant Jossem and her co-defendant and mother Edith Reich and their shell corporations with which this Court and Judge Koeltl are all-too familiar. Only those facts relevant to the instant contempt proceedings are set forth below.[1]

### Jossem's Dealings With Christie's And The Attachment Order Against Jossem

On January 15, 2004 Jossem entered into a consignment agreement with Christie's for the sale of her artwork, jewelry and furniture. (Dkt. No. 452: JSC 4/11/05 Proposed Certification

---

[1]    This Court's Opinion and Order dated August 16, 2005 requiring Jossem to reimburse JSC over $100,000 in attorneys' fees also provides further background information about Jossem's earlier dealings with Christie's, including her change of her account at Christie's from her name to that of a shell company, Burnett Trading. (See also Dkt. No. 452: JSC 4/11/05 Proposed Certification of Facts ¶¶ 1-5.)

of Facts [hereinafter "COF"] ¶ 6; Dkt. No. 218: 6/23/04 Tiska Aff. Ex. 12: 1/15/04 "Consignment, Advance and Security Agreement.")  On that same date, Jossem received a $350,000 advance from Christie's ("first Christie's advance") which, as per their agreement, was transferred by Christie's to the Mercantile Discount Bank in Israel into the account of "Patricia, Inc.," care of Michael Shine, Jossem and Reich's personal attorney in Israel.  (JSC 4/11/05 COF ¶ 6; 3/3/05 Tiska Aff. Ex. 11: 1/14/04 Shine Email to Christie's & 1/15/04 "Inquire Customer Transfer" record.)

On February 3, 2004, Judge Koeltl signed an Order to Show Cause for an order of attachment of Jossem's assets, which was served upon counsel for Jossem and the other defendants in this action.  (JSC 4/11/05 COF ¶ 7; Dkt. No. 78: 2/4/04 Certificate of Service.)  The next day, on February 4, 2004, under the same consignment agreement, Jossem arranged for a second Christie's advance, of $275,000.  (JSC 4/11/05 COF ¶ 7; 6/23/04 Tiska Aff. Ex. 3: McGorry Dep. at 103-04; 6/23/04 Tiska Aff. Ex. 15: Annex I to 1/1/504 Consignment Agreement & 2/4/04 promissory note.)

On February 6, 2004, Judge Koeltl held a hearing on JSC's motion for an order of attachment.  (Dkt. No. 141: 2/6/04 Koeltl Conf. Transcript ("Tr.").)  While the attachment motion was pending, Christie's wired the $275,000 second Christie's advance to an account in the name of defendants' Israeli law firm Herzog, Fox & Neeman at the United Mizrahi Bank in London as directed by Michael Shine on behalf of Jossem.  (JSC 4/11/05 COF ¶ 8; 3/3/05 Tiska Aff. Ex. 11: 2/10/04 Shine Email & 2/12/04 "Inquire Customer Transfer" record; 6/23/04 Tiska Aff. Ex. 3: McGorry Dep. at 159-61.)

On February 26, 2004, while the attachment order motion was still pending, Jossem entered into another consignment agreement with Christie's (Israel) (JSC 4/11/05 COF ¶ 9; 6/23/04 Tiska Aff. Ex. 18: 2/26/04 Consignment Agreement; 6/23/04 Tiska Aff. Ex. 3: McGorry Dep. at 136-38) and received an advance of $165,000 on that same day ("third Christie's advance") which was wired to the Herzog, Fox & Neeman account in London. (JSC 4/11/05 COF ¶ 9; 3/3/05 Tiska Aff. Ex. 11: 2/26/04 "Inquire Customer Transfer" record; 6/23/04 Tiska Aff. Ex. 19: 2/26/04 Jossem Promissory Note.)

On March 13, 2004, Judge Koeltl signed the attachment order and faxed it to all counsel. (JSC 4/11/05 COF ¶ 10; 6/23/04 Tiska Aff. Ex. 21: 3/13/04 Koeltl Attachment Order.) Notwithstanding the order of attachment,[2] on March 17, 2004, Jossem consigned more jewelry to Christie's under her January 15, 2004 consignment agreement and arranged for another advance from Christie's for $180,000 which Jossem directed to be wired to the Herzog, Fox & Neeman London account. (JSC 4/11/05 COF ¶ 10; 6/23/04 Tiska Aff. Ex. 3: McGorry Dep. at 138-43; 6/23/04 Tiska Aff. Ex. 22: 3/17/04 Annex I to 1/15/04 Consignment Agreement; 3/3/05 Tiska Aff. Ex. 11: 3/18/04 "Inquire Customer Transfer" record.)

Therefore, as of March 17, 2004, Jossem had arranged for $970,000 in advances from Christie's to be wired overseas. (JSC 4/11/05 COF ¶ 10; 6/23/04 Tiska Aff. Ex. 22: Annex I to 1/15/04 Consignment Agreement; see 3/3/05 Tisk Aff. Ex. 11: transfer records.) The final advance

---

[2]    In addition to service on her counsel, Jossem was served with the Order of Attachment on April 2, 2004 by the United States Marshals Service. (See Dkt. No. 499: 7/29/05 Dunn Aff. Ex. 16: 7/20/04 Koeltl Order; 6/23/04 Tiska Aff. Ex. 23: 4/2/04 Attachment Order.)

of $180,000 has been repatriated and is currently held in escrow by Jossem's former counsel, the Sonnenschein firm. (JSC 4/11/05 COF ¶ 10 n.5; 3/3/05 Tisk Aff. Ex. 12: 10/25/04 Sonnenschein Letter.) The remaining funds that were spirited overseas, and are at issue on the contempt motion, total $790,000. (See JSC 4/11/05 COF ¶ 10 n.5.)

**JSC's Discovery of the "Apartment Documents" and Its Application for Rule 37 Sanctions**

As a result of Jossem's (unrelated) failure to comply with the Attachment Order, Judge Koeltl granted JSC's request for an order directing the United States Marshals to seize certain property in Jossem's Manhattan and Amagansett residences. (See JSC 4/11/05 COF ¶ 11.) On May 11, 2004, during the course of the seizure in Jossem's Manhattan apartment, counsel for JSC observed thousands of documents that had not been produced despite discovery requests calling for their production.[3/] (JSC 4/11/05 COF ¶ 11; 6/23/04 Tiska Aff. Ex. 29: Dunn Aff. ¶ 19.) One category of the "Apartment Documents" concerned Patricia, Inc. – the entity to which some of the Christie's advances were wired in Israel. (6/23/04 Tiska Aff. Ex. 1: 9/24/04 Feinberg Aff.) Jossem's counsel did not allow JSC to remove any of those documents from the apartment. (Id. ¶¶ 3-4.)

According to JSC, Jossem has never produced any documents concerning Patricia, Inc. (Dkt. No. 452: JSC 4/11/05 COF ¶ 14.) Additionally, before the instant contempt motions

---

[3/]     On October 16, 2003, JSC served its first request for documents on Jossem which included, inter alia, "[a]ll documents concerning any purchase or sale by Reich, Jossem or B[u]rnett Trading through Christie's . . ." (6/23/04 Tiska Aff. Ex. 7: JSC First Request for Production of Documents No. 58), and all documents which identify all items "purchased or sold by Reich, Jossem or B[u]rnett Trading through Christie's or Sotheby's" along with documents showing the "disposition of funds received by Reich, Jossem or B[u]rnett Trading for any sale of artwork, jewelry or other item through Christie's or Sotheby's." (Id., Nos. 92, 94.)

were filed, Jossem had never produced any documents concerning her 2004 consignment agreement with Christie's and the $970,000 in advances she received from Christie's via overseas wire transfers. (Id.)

After a series of hearings before me on May 21, 2004, June 14, 2004, June 28, 2004 and July 15, 2004, and numerous Orders and Memo Endorsed Orders, at a conference on September 21, 2004, this Court sanctioned Jossem pursuant to Federal Rule of Civil Procedure 37 and its inherent powers, ordering her to pay JSC's reasonable attorneys' fees for the "at least three, if not more, motions or applications" that JSC had to make in order to receive the documents. (JSC 4/11/05 COF ¶¶ 13-15; 3/3/05 Tiska Aff. Ex. 4: 9/21/04 Peck Conf. Tr. at 41.) See JSC Foreign Eco. Ass'n Technostroyexport v. International Dev. & Trade Servs., Inc., 03 Civ. 5562, 2005 WL 1958361 at *3-9 (S.D.N.Y. Aug. 16, 2005) (Peck, M.J.). The Court found the prejudice JSC incurred because of the delayed production of the Apartment Documents included, inter alia, that the money comprising the Christie's advances would have been subject to the Attachment Order had the documents been timely produced and therefore no expatriation would have been permitted. (Id. at 42.) Therefore, the Court ruled that "in fairness, the money ought to be brought back to the United States, where it will sit in an interest-bearing account. . . ." (Id.) Thus, as a "partial resolution," the Court "direct[ed] that Ms. Jossem directly or indirectly . . . inform the court of the whereabouts of the money that went to Israel that is at issue in this motion and exact details as to where it currently is." (Id. at 44.) Further, the Court made clear that if Mr. Shine would not provide the information and Jossem asserted her 5th Amendment privilege, then the Court would consider ordering

"repatriation, which would be the first step presumably to ordering Ms. Jossem put in jail for contempt." (Id.) Jossem's response was due September 28, 2004. (Id. at 45.) While Jossem filed objections to the Court's award of attorneys' fees to JSC, she did not file timely objections to the September 21, 2004 repatriation-oriented order.

**The October 7, 2004 Order and Ensuing Events**

        This Court's October 7, 2004 Memo Endorsed Order stated:

> Based on the latest production of documents, and based on the motion by plaintiff and the hearing transcript, because of the highly unusual nature of this action (or rather the Reich-Jossem defendants' actions in connection with this case), and in light of the absence of information about the current location of the funds transferred to Israel, as a discovery sanction the Court orders Ms. Jossem to repatriate the funds to New York (to be put in the Marshal's custody pursuant to the prior attachment order) by 10/15/04 or face contempt charges.

(3/3/05 Tiska Aff. Ex. 7: 10/7/04 Peck Order.) Jossem did not file objections to the October 7, 2004 Order. (See JSC 4/11/05 COF ¶ 19.)

        Jossem did not repatriate the funds by October 15; instead, her counsel submitted a letter to the Court stating that they were "prepared to provide the Court with information as to the disbursement of those funds beyond the accounts to which they were initially transferred" as evidence to show Jossem's "present inability to comply" with the October 7, 2004 Order. (3/3/05 Tiska Aff. Ex. 8: 10/15/04 Sonnenschein Letter.) However, Jossem's counsel sought this Court's guidance as to how to comply with the Order without waiving Jossem's Fifth Amendment privilege. (Id.; see JSC 4/11/05 COF ¶ 20.) This Court's October 15, 2004 Memo Endorsed Order responded that:

> Defendants should see if plaintiff's counsel will agree to accepting this information on a "no waiver" (of the 5th Amendment privilege) basis. If not, if the information can be provided by someone other than Reich/Jossem, you should do so. If not, you will have to decide what to do and take your chances.

(3/13/05 Tiska Aff. Ex. 9: 10/15/04 Peck Memo Endorsed Order; <u>see</u> JSC 4/11/05 COF ¶ 21.)

On October 25, 2004 Jossem's counsel submitted a letter which first, explained that they could not reach an agreement with JSC to provide the information on a "no waiver" basis and, second, provided information concerning the ultimate disposition of each of the Christie's advances. (3/3/05 Tiska Aff. Ex. 10: 10/25/04 Sonnenschein Letter; <u>see</u> JSC 4/11/05 COF ¶ 22.) This information, however, was provided in an unsworn letter by Jossem's counsel who did not have personal knowledge of the disbursements and had compiled the information from unidentified sources other than Reich or Jossem. (3/3/05 Tiska Aff. Ex. 10; <u>see</u> JSC 4/11/05 COF ¶ 22.) According to Jossem's counsel's information, most of the money went to various attorneys in the United States, including Reich and Jossem's former counsel (Williams & Connolly), former counsel to certain now-defaulted corporate defendants (Greenberg Traurig), and defendants' personal attorney (Jerrold Morgulas). (3/3/05 Tiska Aff. Ex. 10; <u>see</u> JSC 4/11/05 COF ¶¶ 23-24.)

Accordingly, this Court's October 25, 2004 Memo Endorsed Order provided that:

> It appears that Ms. Jossem has used these funds to pay its counsel, and others, instead of having it attached by JSC – which is, at the least, unfair to JSC. It also appears peculiar, to say the least, that Jossem needed to send money to Israel only to have that money paid to her counsel in the U.S. Without explanation, that has a certain "odor" and appears to be done to hide or keep assets from JSC. The Court, however, awaits JSC's suggestions as to how to proceed.

(3/3/05 Tiska Aff. Ex. 12: 10/25/04 Peck Memo Endorsed Order.)

In response, JSC's October 26, 2004 letter to the Court outlined it's dissatisfaction with Jossem's counsel's October 25th letter and raised the merits-based question of why Jossem would be paying legal fees to attorneys who had represented a number of the corporate defendants. (10/26/04 JSC Letter.) JSC requested either that the money be repatriated or information be submitted as to the "money trail" of the Christie's advances in the form of bank records and/or sworn affidavits by third parties who consent to be deposed demonstrating that the money that went to the entities listed in Sonnenschein's October 25th letter was actually from the Christie's advances. (Id.)

The Court's October 26, 2004 Memo Endorsed Order provided:

1.    Jossem is to repatriate the money or provide the detailed bank records and/or affidavits to show the movement of the money, the reasons for all money movements and payments, and the other information requested by plaintiff's counsel. For example, why was money paid to Mr. Morgulas? Why can't it be recovered?

2.    The Court also notes that plaintiff can use Mr. Newman's letter as further proof of plaintiff's [piercing] the veil/alter ego claims.

3.    The deadline is 11/1.

(Dkt. No. 401: 10/26/04 Peck Memo Endorsed Order.) Not surprisingly, rather than complying, Jossem's counsel wrote to the Court on November 1st essentially reiterating their October 25th letter. (3/3/05 Tiska Aff. Ex. 13: 11/1/04 Sonnenschein Letter; see JSC 4/11/05 COF ¶ 26.) As the Court pointed out, while this letter provided further "proof to pierce the veil as between Reich/Jossem and the [other defendant] entities," it did little to provide evidence of Jossem's inability to comply with the repatriation Order. (11/3/04 Peck Memo Endorsed Order.) Additionally, the mere assertion that

Morgulas received money into a Merrill Lynch account without providing the documents to the Court, did nothing to show disbursement of Christie's funds from that account. (See id.)

JSC's November 9th submission provided the Court with the deposition of Jerrold Morgulas in which Morgulas explained that he had set up the CMA Merrill Lynch account at Reich's direction to be used to pay their living expenses. (3/3/05 Tiska Aff. Ex. 14: 11/9/04 JSC Letter; 11/9/04 JSC Letter Att.: Morgulas Dep. at 65-68, 154.) Morgulas testified that he was just the name on the account; Reich had a checkbook for the account with pre-signed checks to use however they wanted: "it was their money, they could do with it what they needed to do." (Morgulas Dep. at 91-92.)[4] Morgulas made no deposits himself into the account; rather, all of the money was wired into the account from other sources. (Morgulas Dep. at 104.) In April or May 2004, Morgulas closed the account because of constant overdrafts that he had to cover. (Morgulas Dep. at 133-34.)

As of November 9th, Jossem had still failed to provide competent evidence of an inability to comply with the October 7th Order, and thus the Court gave Jossem yet another deadline: until November 15th to "purge herself of the finding of Contempt by supplying direct evidence to the Court or repatriating the money." (3/3/05 Tiska Aff. Ex. 15: 11/9/04 Peck Memo Endorsed Order; see JSC 4/11/05 COF ¶ 15.) Jossem was further warned that if she failed to comply, "plaintiff

---

[4]      Indeed, Jossem's counsel explained that Jossem used the account for her own living expenses: "there were two bank accounts that Mr. Morgulas used to hold funds for Mrs. Reich or Ms. Jossem. The first account was the Merrill Lynch account to which some of the proceeds of the Christie's Funds at issue were transferred so that Ms. Jossem could use the funds to pay her living expenses (as they were her funds to begin with)." (Jossem Opp. to JSC COF at 5.)

shall proceed before Judge Koeltl for adoption of [this Court's] recommendation as to contempt and for enforcement via appropriate remedies, including jailing Ms. Jossem." (3/3/05 Tiska Aff. Ex. 15.) On November 15, 2004, Jossem's counsel submitted another unsworn letter which reiterated the same information as had been in the October 25th and November 1st letters and charged that plaintiff "knows exactly where the Christie's funds were ultimately distributed," yet provided only the Morgulas Merrill Lynch account records showing merely that money was wired in from Shine and Herzog, Fox & Neeman but not that it was the actual Christie's funds. (3/3/05 Tiska Aff. Ex. 16: 11/15/04 Sonnenschein Letter; JSC 4/11/05 COF ¶ 29.) The Court gave Jossem another chance to "provide appropriate bank statements/records to verify the information in [the 11/15/04] letter." (3/3/05 Tiska Aff. Ex. 17: 11/16/04 Peck Memo Endorsed Letter; <u>see</u> JSC 4/11/05 COF ¶ 30.)

On January 3, 2005, after the Court had to order a date certain for submission of the information ordered on November 16th, Jossem's counsel submitted a letter claiming that no further information could be provided because both Shine and Neeman declined to provide the requested information due to client confidentiality under Israeli law, that unless waived, would bar any submissions from them. (3/3/05 Tiska Aff. Ex. 22: 1/3/05 Sonnenschein Letter; <u>see also</u> <u>id</u>. Ex. 21: 12/22/04 Peck Memo Endorsed Order; JSC 4/11/05 COF ¶¶ 31-34.) The Court responded by ordering that "Jossem should waive such confidentiality. Until she does so, the Court believe[d] the key to her 'purging' her contempt remains in her hands. She is to waive confidentiality by 1/7/05 and the documents are to be produced by <u>1/21/05</u>, or plaintiff should move before Judge Koeltl for appropriate contempt sanctions." (3/3/05 Tiska Aff. Ex. 23: 1/3/05 Peck Memo Endorsed Order; <u>see</u>

JSC 4/11/05 COF ¶ 35.)  When Jossem failed to produce any information by January 21st, the Court gave JSC permission "to move directly to Judge Koeltl" for contempt proceedings.  (3/3/05 Tiska Aff. Ex. 24: 1/28/05 Peck Memo Endorsed Order.)

On March 31, 2005 at the contempt hearing, Judge Koeltl denied the order to show cause for contempt without prejudice so that plaintiffs could seek an order to show cause from this Court along with a certification of facts pursuant to 28 U.S.C. § 636(e)(6).  (Dkt. No. 455: 3/31/05 Koeltl Conf. Tr. at 41-42; Dkt. No. 449: 4/4/05 Koeltl Order.)  Judge Koeltl commented on the issues he thought would be before the Court, "[n]amely, the nature of the order and the specificity of the funds, . . . and also the nature of the evidence that would or should be produced in any subsequent proceeding."  (3/31/05 Koeltl Conf. Tr. at 42.)  Further Judge Koeltl commented:  "it's obvious to me that Magistrate Judge Peck was asking for bank documents for a long period of time to attempt to see whether there was substantiation for some of the arguments that were being made. And it appears that those documents were not forthcoming.  But in any proceeding before me, I can only go on the record that is before me."  (Id. at 42-43.)

Therefore, the parties submitted proposed certification of facts to the Court.  (Dkt. Nos. 452, 453-54.)  Jossem's submission relied on evidence not previously provided to this Court or Judge Koeltl despite the agonizing months of JSC's requests and this Court's orders outlined above.  Included in Jossem's evidence was, inter alia, Shine's and Sue Black's (an official of the London Bank) sworn statements with information on the receipt and disbursement of the three Christie's advances at issue. (Dkt. No. 454: Akbar Aff. Ex. A: Shine Sworn Letter; id. Ex. E: Black

Sworn Statement.) JSC objected to admission of these statements without having the opportunity to depose Shine and Black. (4/20/05 Dunn Letter.) This Court agreed. (4/20/05 Peck Order.) The deposition of Yaakov Neeman, of Herzog, Fox & Neeman, has been taken (see, e.g., Dkt. No: 492: 6/29/05 Disc. Conf. Tr.; 7/29/05 Dunn Aff. Ex. 10: Neeman Dep. excerpts), as has the deposition of Michael Shine (see, e.g., 7/29/05 Dunn Aff. Ex. 21: Shine Dep. excerpts).[5/]

**Jossem's Evidence of the Disbursement of the Christie's Adances**

The evidence that Jossem's counsel submitted shows the disbursement of each of the Christie's Advances, as discussed below.

### The First Christie's Advance on January 15, 2004–$350,000

On January 15, 2004 Christie's wired $350,000 to Patricia, Inc., care of Michael Shine in Israel, received on January 16. (Dkt. No. 454: Akbar Aff. Ex. A: Shine Letter Exs. 1.1 & 1.2: Mercantile Discount Bank Records; see also 3/3/05 Tiska Aff. Ex. 11: Transfer Records.) The actual amount deposited, minus transfer fees, was $349,989. (Ex. A: Shine Letter Exs. 1.1 & 1.2.) Once received, Shine instructed the bank to transfer the funds to his law firm's general trust account for ease of disbursement. (Akbar Aff. Ex. A: Shine Letter & Ex. 2: 1/16/04 Mercantile Discount Bank Record.) The balance in the Patricia, Inc. account before the Christie's transfer was $0 and returned to $0 after Shine moved the funds to his firm's trust account. (Akbar Aff. Ex. A: Shine Letter Exs.

---

[5/] Even though Sue Black submitted a sworn statement about the Herzog, Fox & Neeman account, Neeman's deposition is acceptable to this Court as sufficient to provide the information JSC would need regarding the three Christie's advances such that a deposition of Sue Black herself is unnecessary.

3.1 & 3.2: 2/29/04 & 4/5/04 Redacted Mercantile Discount Bank Statements.)  The $349,989 was disposed of by Shine as follows:

- $161,068.33 to Williams & Connolly on January 16, 2004.  (Akbar Aff. Ex. A: Shine Letter at 2 & Ex. 4: 1/16/04 Bank Transfer Record.)

- $20,000 to Paul Bergman on January 16.  (Shine Letter at 2 & Ex. 5: 1/16/04 Bank Transfer Record.)

- $100,000 to Jerrold Morgulas Merrill Lynch Account on January 16.  (Shine Letter at 2 & Ex. 6: 1/16/04 Bank Transfer Record.)

- $47,500 to Greenberg Traurig on January 16.  (Shine Letter at 2 & Ex. 8: 1/16/04 Bank Transfer Record.)

- $7,966.85 to Esseks Hefter on January 21.  (Shine Letter at 2 & Ex. 9: 1/21/04 Mercantile Bank Transfer Record.)

- $953.82 wire transfer and miscellaneous expenses.  (Shine Letter at 2.)

- $12,500 to Greenberg Traurig on January 7, which Shine asserts was paid in anticipation of the Christie's advance and which he credited himself when the advance was actually made.  (Shine Letter at 2 & Ex. 7: 1/7/04 Mercantile Bank Record.)

Williams & Connolly is former counsel to Jossem and Reich.  (Dkt. No. 453: Jossem Opp. to JSC COF at 4.)  Paul Bergman was prior counsel for various corporate defendants that have been dismissed from the action.  (Id. at 5.)  Jerrold Morgulas is an attorney who maintained a Merrill Lynch Account in his name for Reich's and Jossem's personal finances.  (See page 10 above & page 21 below.)  Esseks Hefter represented "one or more current or former corporate defendants in connection with one or more real estate transactions."  (Jossem Opp. to JSC COF at 5.)  The wire to Greenberg Traurig was received in the name of its clients Atrium Square, P & F Equities Inc., and

M & B Oxford 41, Inc. (Akbar Aff. Ex. A: Shine Letter Ex. 8; Akbar Aff. Ex. C: 1/7/04 & 1/16/04 Incoming Wire Transfer Records) and the wire to Esseks Hefter was remitted in the name of its client "Atrium Square et. al." (Akbar Aff. Ex. A: Shine Letter Ex. 9.) All of this is helpful to JSC's alter ego claims.

As to the Morgulas Merrill Lynch account, the January statement shows an opening balance on January 1 of $188.22, and that a total of $27,707 was deposited into the account before the next Christie's transfer (aside from the Christie's money) and $130,081.92 in withdrawals or checks-written was debited from the account on or after January 16, 2005.[6/] (Akbar Aff. Ex. D: 1/04 CMA Merrill Lynch Statement at 5-9.) These numbers show that the $99,975 wire transfer of the Christie's money was used in its entirety to pay Jossem's bills.

### The Second and Third Christie's Advances on February 12 for $275,000 and March 3 for $165,000

Sue Black, Financial Controller at United Mizrahi Bank in London, submitted a sworn declaration with the bank records of the transfer into the Herzog, Fox & Neeman account and the disbursements therefrom. (Akbar Aff. Ex. E: Black Statement.) The "transaction history" from the United Mizrahi Bank shows that on February 1 the balance in the Herzog, Fox & Neeman account was $0. (Akbar Aff. Ex. E: Black Stmt. Ex. A: "Transaction History.") Then, on

---

[6/] Withdrawals, checks-written and deposits were counted as of 1/16 through 2/16–the day before the second Christie's advance was transferred into the account. Checks written to "cash" were not included in these calculations since that money presumably went to Jossem. Overdraft loans and repayments were not counted because of Morgulas' testimony that he covered overdrafts from his own money.

February 12 – posted to the bank record on the 13th – $275,000 was received from Christie's. (Id.)
The money was paid out as follows:

- $100,000 paid to a Merrill Lynch Account on February 17.

- $150,000 paid to Williams & Connolly on February 18.

- $3,425 listed as "Our Purchase" on February 20.[7]

(Id.)

On February 26th (posted on February 27th) $165,000 was received into the account
from Christie's. (Id.) On March 3, $186,527.32 was paid out of the account as follows:

- $66,527.32 to Greenberg Traurig.

- $60,000 to Herzog, Fox & Neeman.

- $60,000 to a Merrill Lynch Account.

(Id.)

Therefore, from the second and third Christie's advances of $440,000 wired into the
Herzog, Fox & Neeman account, $439,952.32 was paid out to the above-listed payees. The bank
record also shows that after the final payment out of the account on March 3, the account balance
was $0. (Id.)

---

[7] Jossem's counsel asserts that the $3,425 paid out on February 20 went to the law firm of
Staiger, Schwald & Sauter but supplied no documentation of this fact and refers only to its
previous letters which this Court found inadmissible as evidence of Jossem's inability to
comply with the Order. (Dkt. No. 453: Jossem Opp. to JSC COF at 7 & n.3.)

Similar to the January transfer, after the second Christie's Advance was transferred into Morgulas' Merrill Lynch account in the amount of $99,975 on February 17, $51,200 came into the account from other sources (not including overdraft loans) and $108,839.93 was taken out in the form of checks-written on or after February 17 and withdrawals. (Akbar Aff. Ex. D: 2/04 CMA Merrill Lynch Statement at 6-7.)[8] The opening balance of the account in February was $2,596.55 (Id. at 5.) These numbers show that $55,043.38 of the $99,975 portion of the second Christie's advance was actually used; leaving $44,931.62 not used and which must be repatriated.

After the third Christie's advance was transferred into the account in the amount of $59,973 on March 3, $87,974 additional came into the account throughout March and $46,404.77 was paid out in checks-written after March 3 and withdrawals. (Akbar Aff. Ex. D: 3/04 CMA Merrill Lynch Statement at 6-8.)[9] The opening balance of the account in March was $7,665.24. (Id. at 5.) These calculations show that none of the third Christie's advance was used to pay checks and

---

[8] Withdrawals, checks-written and deposits were counted as of 2/17 through 3/2–the day before the third Christie's advance was transferred into the account. Checks written to "cash" or to "payee unrecorded" were not included in these calculations since that money presumably went to Jossem. The $5,000 wire transfer out on February 19 was not included in these calculations because there is no record of where this money went, and therefore it presumably went to Jossem. As with the prior month, overdraft loans and repayments were not counted.

[9] Withdrawals, checks-written and deposits were counted as of 3/3 through the end of the month. Checks written to "cash" were not included in these calculations. The Court acknowledges that Jossem may have written checks after March 3 that did not clear until subsequent months and thus are not included in the Court's calculations. It was Jossem's burden to provide evidence of her use of the Christie's funds, however, and she did not provide bank or Merrill Lynch statements after the March 2004 statement.

withdrawals for March, which means $59,973 of the third Christie's advance was not used and must be repatriated.

## ANALYSIS

"A party may be held in civil contempt for failure to comply with a court order if '(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner.'" Paramedics Electromedia Comercial, Ltda. v. GE Med. Sys. Info. Tech., Inc. 369 F.3d 645, 655 (2d Cir. 2004). "It need not be established that the violation was willful." Id.

Here, it is undisputed that this Court issued a "clear and unambiguous" order (indeed, orders) and that Jossem has failed to comply. (See pages 7-12 above.) Specifically, on October 7, 2004, this Court issued an Order that stated:

> Based on the latest production of documents, and based on the motion by plaintiff and the hearing transcript, because of the highly unusual nature of this action (or rather the Reich-Jossem defendants' actions in connection with this case), and in light of the absence of information about the current location of the funds transferred to Israel, as a discovery sanction the Court orders Ms. Jossem to repatriate the funds to New York (to be put in the Marshal's custody pursuant to the prior attachment order) by 10/15/04 or face contempt charges.

(3/3/05 Tiska Aff. Ex. 7: 10/7/04 Peck Memo Endorsed Order.) Jossem never filed objections to that Order. Jossem has never demonstrated any misunderstanding of the Order and, more importantly, has never attempted to comply. Rather, through counsel, Jossem has asserted that she is unable to

comply with the Order due to "present[] impossib[ility]," i.e., her disbursement of those funds. (Jossem Opp. to JSC COF at 1.)[10/]

**A.** **Jossem Should be Held in Contempt for a Portion of the Christie's Advances**

"A civil contempt order is designed to be coercive rather than punitive. Accordingly, a party's complete inability, due to poverty or insolvency, to comply with an order to pay court-imposed monetary sanctions is a defense to a charge of civil contempt. The alleged contemnor bears the burden of producing evidence of his inability to comply." Huber v. Marine Midland Bank, 51 F.3d 5, 10 (2d Cir. 1995) (citations omitted); accord, e.g., United States v. Chusid, 372 F.3d 113, 117 (2d Cir. 2004); United States v. Paccione, 975 F. Supp. 537, 543 (S.D.N.Y. 1997). The burden is met if the alleged contemnor can establish her inability "'clearly, plainly, and unmistakably.'" S.E.C. v. Zubkis, 97 Civ. 8086, 2003 WL 22118978 at *4 (S.D.N.Y. Sept. 11, 2003) (Koeltl, D.J.); accord, e.g., Huber v. Marine Midland Bank, 51 F.3d at 10; United States v. Chusid, 372 F.2d at 117; A.V. By Versace, Inc. v. Gianni Versace, S.p.A., 279 F. Supp. 2d 341, 346 (S.D.N.Y. 2003) (burden "is not easily met"). This inability must amount to an impossibility to comply. E.g., Huber v. Marine Midland Bank, 51 F.3d at 10; S.E.C. v. Platinum Inv. Corp., 02 Civ. 6093, 2004 WL 1886401 at *3 (S.D.N.Y. Aug. 24, 2004); A.V. By Versace, Inc. v. Gianni Versace, S.p.A., 279 F. Supp. 2d at 346. If a party fails to meet her burden because she asserts her Fifth Amendment privilege and refuses to

---

[10/]     At the March 31 contempt proceeding before Judge Koeltl, the parties discussed whether the October 7 Order required repatriation of the specific funds transferred from Christie's or just any amount of money totaling $790,000. (See Dkt. No. 455: 3/31/05 Koeltl Conf. Tr. at 7-11.) The October 7 Order "clearly and unambiguously" requires repatriation of the specific Christie's funds. (10/7/04 Peck Memo Endorsed Order.)

produce evidence, she may be held in contempt.  See, e.g., United States v. Rylander, 460 U.S. 752, 758, 103 S. Ct. 1548, 1553 (1983); United States v. Paccione, 975 F. Supp. at 544.

Jossem's defense is that, before the court issued the October 7 Order, the money comprising the Christie's Advances was distributed to payees out of her control, rendering the money irretrievable.

First, the paper trail submitted by Jossem through her counsel shows that the Christie's advances went into the London and Israel accounts and then, for the most part, were disbursed to pay Jossem and Reich's present and former attorneys.  While these Christie's advances occurred technically outside the reach of the attachment order, the wire transfers are a transparent attempt at funneling money through overseas accounts to avoid the court's authority.  However, the payments made to Greenberg Traurig, Williams & Connolly and Esseks Hefter are now out of Jossem's (and Shine and Neeman's) control.[11]  Missing from Jossem's submissions, however, is any effort to obtain the return of the funds disbursed at her direction to "her" various attorneys.  To purge herself of contempt, Jossem must use her "best efforts" to obtain the return of the funds transferred to the above-listed law firms.  See S.E.C. v. Bankers Alliance Corp., No. Civ. A. No. 95-0428, 1995

---

[11]     From the Neeman deposition, it is apparent that Yaakov Neeman was under Jossem and Reich's control and had the money stayed in this account, the Court would have found it able to be repatriated. (7/29/05 Dunn Aff. Ex. 10: Neeman Dep. excerpts.) Thus, were the money still within the Shine and Herzog, Fox & Neeman accounts, the money would clearly be under Jossem's control and able to be repatriated.

WL 590665 at *10 (D.D.C. May 5, 1995).[12] Jossem must repatriate these funds or demonstrate, in detail, her efforts to obtain the return of these portions of the Christie's funds. See S.E.C. v. Bankers Alliance Corp., 1995 WL 590665 at *10.

Second, the money that went to the Merrill Lynch account in Jerrold Morgulas' name cannot be considered disbursed in full. It is clear from Morgulas' deposition that the money in this account was for Jossem's (and/or Reich's) personal use, to spend as she saw fit. (See page 10 & n.4 above.) While part of the money wired into the Merrill Lynch account from the Christie's advances was used to pay bills – and therefore is now irretrievable – there was other money that was in that account before the January, February and March transfers and there was other money that came in after those transfers. (See pages 15, 17-18 above.) Jossem has thus not shown impossibility with respect to the unused portions of the Christie's funds and her failure to repatriate those funds renders her in contempt. See S.E.C. v. Zubkis, 2003 WL 22118978 at *4 ("[I]nability to pay is a defense only when it is impossible for the contemnor to pay any portion of the ordered disgorgement; '[o]therwise, the party must pay what he or she can.'") Consequently, Jossem must return the unused

---

[12]    See also, e.g., National Basketball Ass'n v. Design Mgmt. Consultants, Inc., 289 F. Supp. 2d 373, 377-78 (S.D.N.Y. 2003) (in trademark infringement case, defendants did not demonstrate reasonable diligence in attempting to comply with preliminary injunction where they failed to "present[] the Court with evidence that an effective or specific set of instructions was issued to those persons directed to remove Disputed Merchandise from sale" and failed to provide plaintiffs with an appropriate accounting of their profits and sales.); A.V. By Versace, Inc. v. Gianni Versace, S.p.A., 279 F. Supp. 2d at 347, 355 (defendant's failure to produce, inter alia, signed tax returns was not a reasonable effort to meet his burden to show inability to comply with the court's order).

portions of the second and third Christie's advances: $44,931.62 and $59,973 (see pages 17-18 above) for a total of $104,904.62.

Further, Jossem has not met her burden of demonstrating impossibility to comply with respect to the $3,425 paid out on February 20 that purportedly went to Staiger, Schwald & Sauter. (See page 16 & n.7 above.) Jossem's failure to provide competent evidence that this transfer was actually disbursed to an account out of her control renders her in noncompliance of this portion of the October 7 Order and consequently in contempt.

### B. The Appropriate Remedy for Jossem's Contempt

"The imposition of civil contempt sanctions may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged." Paramedics Electromedia Comercial, Ltda.. v. GE Med. Sys. Info. Tech., Inc. 369 F.3d 645, 657 (2d Cir. 2004); New York State Nat'l Org. for Women v. Terry, 159 F.3d 86, 93 (2d Cir. 1998), cert. denied, 527 U.S. 1003, 119 S. Ct. 2336 (1999); A.V. By Versace, Inc. v. Gianni Versace, S.P.A., 279 F. Supp. 2d 341, 354 (S.D.N.Y. 2003). Sanctions for civil contempt may not be imposed for punitive effect. Paramedics Electromedia Comercial, Ltda.. v. GE Med. Sys. Info. Tech., Inc. 369 F.3d at 657. Courts within this Circuit have broad discretion to divine an appropriate coercive sanction, under the guidance of several factors: "'(1) the character and magnitude of the harm threatened by the contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction.'" S.E.C. v. Zubkis, 97 Civ. 8086, 2003 WL 22118978 at *4 (S.D.N.Y. Sept.

11, 2003) (Koeltl, D.J.); see also, e.g., Paramedics Electromedia Comercial, Ltda. v. GE Med. Sys. Info. Tech., Inc. 369 F.3d at 657-58.

A court may impose a conditional term of imprisonment to "'compel the contemnor to do what the law made it his duty to do.'" A.V. By Versace, Inc. v. Gianni Versace, S.P.A., 279 F. Supp. 2d at 354-55.

> The paradigmatic coercive, civil contempt sanction, . . . involves confining a contemnor indefinitely until he complies with an affirmative command . . . . Imprisonment for a fixed term similarly is coercive when the contemnor is given the option of earlier release if he complies. In these circumstances, the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus "'carries the keys of his prison in his own pocket.'"

International Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 828, 114 S. Ct 2552, 2557-58 (1994) (citations omitted); see, e.g., Ochoa v. United States, 819 F.2d 366, 369 (2d Cir. 1987). In selecting the appropriate contempt sanction, "'a court is obliged to use the least possible power adequate to the end proposed.'" United States v. Paccione, 975 F. Supp. 537, 545 (S.D.N.Y. 1997). Of course, imprisonment is among the most severe sanctions that can be applied for civil contempt. See id.; see also, e.g., A.V. By Versace, Inc. v. Gianni Versace, S.p.A., 96 Civ. 9721, 98 Civ. 0123, 2004 WL 691243 at *9 (S.D.N.Y. Mar. 31, 2004) (after repeated failure to comply with the court's orders, including contempt orders issuing coercive fines, court was left with "no recourse other than to enter this Order and severe sanction" imprisoning defendant until he complied with the order.). A coercive fine may be imposed so long as the contemnor "is afforded an opportunity to purge." International Union, United Mine Workers of Am. v. Bagwell, 512 U.S. at 829, 114 S. Ct

at 2558; see, e.g., New York State Nat'l Org. for Women v. Terry, 159 F.3d at 93-94; SEC v. Credit Bancorp, 99 Civ. 11395, 2000 WL 968010 at *3 (S.D.N.Y. July 3, 2000).

      JSC argues that Jossem should be imprisoned unless and until she purges herself of contempt to coerce her compliance.  (3/3/05 JSC Br. at 14.)[13]  This Court takes seriously the prospect of imprisonment, especially in a civil context.  However, Jossem's conduct throughout this litigation, especially her penchant for thwarting court orders, leads this Court to the conclusion that only the threat of imprisonment will be effective in coercing her to comply with this Court's Order.  Therefore, Jossem should be found in contempt.  She may purge herself of her contempt by (1) returning and placing into escrow all or a portion of the money that was disbursed from the Christie's advances to Greenberg Traurig, Paul Bergman, Williams & Connolly, Esseks Hefter and Herzog, Fox & Neeman or submitting to the Court, within 10 days of entry of this order, a detailed

---

[13]     Monetary sanctions would not be effective in this case.  This lawsuit involves JSC's attempt to collect its $200 million plus judgment against IDTS from IDTS' alleged alter egos, Jossem and Reich and their shell companies.  All of Jossem's assets are frozen by Judge Koeltl's attachment order.  A civil contempt fine would be meaningless under these facts.  See, e.g., A.V. By Versace, Inc. v. Gianni Versace, S.p.A., 279 F. Supp. 2d at 355 (where coercive fines had proven ineffective in the past, Court conditionally ordered imprisonment as the appropriate remedy for civil contempt subject to defendant's ability to purge himself of the contempt order); S.E.C. v. Margolin, 92 Civ. 6307, 1996 WL 447996 at *5 (S.D.N.Y. Aug. 8, 1996) ("Defendant's failure to comply with the final judgment [– because he claimed financial inability but failed to produce sufficient supporting documentation – ] is a harm of substantial magnitude . . . Careful consideration of the matter therefore leads to the conclusion that incarceration, rather than a fine, is the appropriate coercive remedy in the case at bar."); cf. Peker v. Fader, 965 F. Supp. 454, 458, 460 (S.D.N.Y. 1997) (Koeltl, D.J. & Peck, M.J.) (finding plaintiff in contempt and as appropriate remedy dismissing plaintiff's action because coercive fine would have been meaningless where plaintiff had previously refused to pay court-ordered Rule 37 monetary sanctions and imprisonment was inappropriate due to plaintiff's old age.)

accounting of the efforts she made to obtain this money and the reasons for her inability to now collect this money; (2) returning and placing into escrow, within 10 days, the $104,904.62 that this Court has determined remained in the "Morgulas" Merrill Lynch account from the second and third Christie's advances. The fact that this account is now closed is of no moment since that money was Jossem's upon closing the account, and thus it is assumed any money left in the account was returned to Jossem/Reich; and (3) returning and placing into escrow, within 10 days, $3,425 which was not shown by competent evidence to be impossible to repatriate.

Failure to abide by these conditions <u>will</u> result in Jossem's imprisonment until she chooses to comply. Compliance with this order will end her imprisonment. Jossem thus has the keys to her prison in her own hands.

## <u>CONCLUSION</u>

The facts as set forth above are hereby certified to Judge Koeltl. Jossem should be held in civil contempt and ordered to meet the conditions as set forth above or be taken into the Marshals' custody within 10 days and remain imprisoned until she purges herself of contempt.

## **FILING OF OBJECTIONS TO THIS CERTIFICATION/REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Opinion and Order to file written objections. <u>See also</u> Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable John G. Koeltl, 500 Pearl Street, Room 1030, and to my chambers, 500 Pearl Street, Room 1370.

Any requests for an extension of time for filing objections must be directed to Judge Koeltl. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Secretary of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

DATED:     New York, New York
             August 18, 2005

 

**Andrew J. Peck**
United States Chief Magistrate Judge

Copies to:    David Dunn, Esq.
               Barry A. Bohrer, Esq.
               Edith Reich & Brigitte Jossem (Regular & Certified Mail)
               Judge John G. Koeltl