**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────────────────

**JSC FOREIGN ECONOMIC ASSOCIATION**
**TECHNOSTROYEXPORT,**                        03 Civ. 5562 (JGK)(AJP)

               Plaintiff,              **OPINION AND ORDER**

    - against –

**INTERNATIONAL DEVELOPMENT AND TRADE**
**SERVICES, INC., et al.,**

               Defendants.
────────────────────────────────────────────

**JOHN G. KOELTL, District Judge:**

    The plaintiff, JSC Foreign Economic Association Technostroyexport ("JSC"), moves for an order finding defendant Edith Reich ("Reich") in civil contempt for violation of the Court's Order of Attachment granted after oral argument on July 30, 2004 and issued on August 9, 2004 (the "Attachment Order").

**I.**

    JSC filed this action in July 2003 seeking to hold Reich, her daughter, Brigitte Jossem ("Jossem"), and others liable for a judgment for more than $200 million entered against the defendant International Trade and Development Services, Inc. ("IDTS"). JSC's principal allegation was that IDTS was the alter ego of Reich and Jossem. On July 9, 2004, this Court signed an Order to Show Cause filed by JSC to obtain an order of

1

attachment against Reich.  Argument on JSC's motion for an order of attachment was heard on July 30, 2004, and, on August 9, 2004, this Court granted the order of attachment, up to the amount of $200,000,000, after finding that the requirements of Article 62 of the New York Civil Practice Law and Rules ("C.P.L.R.") had been satisfied.[1]  Under Section 6212(a) of the CPLR, a party may obtain an "order of attachment upon demonstrating that (1) it has stated a claim for a money judgment; (2) it has a probability of success on the merits; (3) the defendant 'with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts;'[2] and (4) the amount demanded from the defendant is greater than the amount of all counterclaims known to the party seeking attachment."  Bank Leumi Trust Co. of N.Y. v. Istim, Inc., 892 F. Supp. 478, 481 (S.D.N.Y. 1995) (quoting N.Y. C.P.L.R. § 6201(3)).

The Court found that JSC had offered evidence sufficient to establish each of these four requirements.  In particular, the

---

[1] New York law governs this action, which was brought pursuant to the Court's diversity jurisdiction under 28 U.S.C. § 1332, and New York law independently applies to the provisional remedy of attachment under Rule 64 of the Federal Rules of Civil Procedure.

[2] C.P.L.R. R. 6212(a) requires a showing that "one or more grounds for attachment provided in section 6201 exist."  For the purposes of this case, as in Bank Leumi, the relevant ground is the one quoted above, found in C.P.L.R. § 6201(3).

2

Court found that "[t]he circumstances of Reich's conduct, as documented in the record before the Court, amply support a finding that Reich has acted with actual intent to frustrate the enforcement of a judgment against her." (Tr. of Proceedings Held on July 30, 2004, at 41.) The evidence established that after restraining notices had been issued against her, Reich had shifted over a million dollars into a Merrill Lynch account in an associate's name, but under Reich's control, and that Reich had deposited funds in other accounts as well. (Id. at 41-44.)

JSC now alleges that, despite the existence of the Attachment Order, Reich has continued her efforts to frustrate enforcement of the judgment against her,[3] and seeks an order holding Reich in civil contempt, directing that Reich purge her contempt, and ordering that Reich be incarcerated unless she complies with the Court's order on this motion within ten days. JSC also requests that the Court cite Reich for criminal contempt and refer the matter to the United States Attorney's Office for prosecution.

In support of its allegations, JSC submitted the Declaration of David Dunn dated July 29, 2005 (the "Dunn Decl.")

---

[3] As indicated, the Court concluded that JSC had shown a high likelihood of success on the merits at the time it granted JSC's motion for an order of attachment. Subsequently, the Court granted JSC's motion for summary judgment on the question of liability by Opinion and Order dated September 6, 2005. See JSC Foreign Economic Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 386 F. Supp. 2d 461 (S.D.N.Y. 2005). Judgment was entered against Reich and other defendants on October 21, 2005.

3

and a Memorandum of Law.  Reich did not submit a formal memorandum of law, but both JSC and Reich sent correspondence relating to this motion to the Court.  A hearing on the motion was held on December 9, 2005, at which the parties argued the motion but no additional evidence was presented.

**II.**

"A party may be held in civil contempt for failure to comply with a court order if '(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner.'" Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 655 (2d Cir. 2004) (quoting King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995)). Applying this test, the Court makes the following findings on the basis of the record before it.

**1.**

With respect to the first prong of the Paramedics Electromedicina test, the Court finds that the Attachment Order was "clear and unambiguous."  "A 'clear and unambiguous' order is one that is 'specific and definite enough to apprise those within its scope of the conduct that is being proscribed.'"

Medallic Art Co., Ltd. v. Novus Mktg., Inc., No. 99 Civ. 502, 2003 WL 22053130, at *1 (S.D.N.Y. Sept. 2, 2003) (quoting N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1352 (2d Cir. 1988)). The Attachment Order in this case specified that "Reich, and all persons acting in concert with her who have notice of this Order, shall not cause or permit the sale, transfer or disposition of any of her assets, whether held in her name or in the name of any other person or entity...." (Attachment Order at 2.) It further provided that "no person or entity with notice of this Order shall assist defendant to sell, transfer or otherwise dispose of any of her assets, whether held in her name or in the name of any other person or entity...." (Id. at 3.) Reich's obligations under the Attachment Order were thus unmistakably clear; she was not to dispose of any of her assets herself, or enlist the assistance of any other person or entity in doing so.

## 2.

The Court further finds that Reich's noncompliance with the Attachment Order has been established by clear and convincing evidence. JSC has presented substantial and unrebutted evidence that Paul Russo ("Russo"), a New York-based jewelry broker, made numerous sales of jewelry, the proceeds of which were under Reich's control. This evidence is credible and establishes

5

clearly and convincingly that Reich violated the Attachment Order by engaging Russo to dispose of assets belonging to her and subject to that order.

Reich has offered no evidence to rebut this showing. To the contrary, in a letter dated December 21, 2005, Reich admitted that she had not complied with the Attachment Order, writing that "[i]t is correct to say that I did not obey the Court's order." (Letter from Edith Reich dated Dec. 21, 2005, at 1.) Reich's letter later specifically acknowledged that "I did such a stupid thing as to hold back the attached jewelry." (Id. at 3.) Due to Reich's plain admission of guilt and the compelling evidence presented by JSC, the Court concludes that the allegations against Reich are true.[4]

The first of Russo's sales of Reich's jewelry occurred on August 17, 2004. Paul Lubetsky ("Lubetsky"), the President and CEO of Windsor Jewelers ("Windsor"), a large New York-based jewelry wholesaler, alleges in a sworn declaration that on that date Windsor purchased a lot of jewelry from Russo, who was acting as a broker on behalf of an unidentified seller, for $135,000. (Declaration of Paul Lubetsky dated March 3, 2005 ("Lubetsky Decl."), Ex. 7 to Dunn Decl.) Payment was sent in two

---

[4] Prior to the December 21, 2005 letter, Reich, Jossem, and Russo had each asserted the Fifth Amendment privilege against self-incrimination throughout this case.

6

installments, for $35,000 and $100,000 to account number 087409 at the United Mizrahi Bank in London, an account held in the name of Herzog Fox & Neeman ("Herzog"), an Israeli law firm that has represented Reich and business entities with which she is affiliated. (Deposition of Yaakov Neeman ("Neeman Dep."), Ex. 10 to Dunn Decl., at 16-17.) Yaakov Neeman, one of the founding partners of the Herzog firm, testified at his deposition that Herzog established this and other accounts for Reich and that she had complete control over the funds deposited therein. (Neeman Dep. at 139-41, 150-52, 175-78.)

On October 13, 2004, Russo, again acting as an agent for an unidentified seller, sold a lot of jewelry to Camilla Dietz Bergeron, Ltd. ("Bergeron"), an international dealer of antique, period, and estate jewelry, for $76,000. (Ex. 11 to Dunn Decl., at 9-11.) Gus Davis ("Davis"), the President of Bergeron, testified in his deposition that Bergeron was initially instructed to wire payment to account number 5008510017 at Bank Winter & Co. in Vienna. (Deposition of Gus Davis ("Davis Dep."), Ex. 6 to Dunn Decl., at 173, 210-14; Ex. 11 to Dunn Decl. at 14.) Davis testified that, when Bergeron's bank demanded the name on the Bank Winter account prior to transferring the funds, Russo "was uncomfortable" providing a name and instead requested that the payment be sent to account number 087410 at United Mizrahi Bank in London. (Davis Dep. at

7

212-14; Ex. 11 to Dunn Decl. at 12-13.)  This account, like account number 087409 at the same bank, was held by the Herzog firm.  (Ex. 11 to Dunn Decl. at 2, 12-13; Neeman Dep. at 209-11.)

Bergeron again bought jewelry from Russo at the end of October or early in November 2004.  In this transaction, seven pieces were purchased for an agreed price of $105,000.  Russo requested part of that sum in cash and received $18,000 in cash from Bergeron.  The wire transfer of the remaining balance was delayed, however, when Bergeron discovered that some of the pearls were plugged.  (Davis Dep. at 145-48.)  Russo contacted Bergeron and informed Davis that "his client was hysterical that the money had not been wired."  (Davis Dep. at 147.)  After Russo promised to provide additional pieces of jewelry, Bergeron wired $100,000 to account number 087410 at United Mizrahi Bank on November 1, 2004.[5]  (Davis Dep. at 147-48; Ex. 11 to Dunn Decl. at 23-24.)

Russo entered into additional transactions in November 2004.  Lubetsky stated under oath that Windsor bought jewels from Russo on November 5, 2004, for $8,200 in cash, on November 9, 2004, for $18,800 in cash, and on November 29, 2004, for

---

[5] The original price agreed upon for this transaction was $105,000, but Bergeron ultimately paid a total of $118,000 – $18,000 in cash and a $100,000 wire transfer – apparently because the value of the additional items provided by Russo exceeded the reduction in the value of the pearls that were plugged.  (Davis Dep. at 147-48.)

8

$9,000 in cash plus $70,000 wired to account number 087410 at United Mizrahi in London. (Lubetsky Decl. ¶¶ 3-4.) This account is corroborated by receipts and bank records. (See Ex. 2 & 3 to Lubetsky Decl.)

On December 15, 2004, Russo brokered a sale of a single strand cultured pearl necklace to Verdura, a New York jewelry retailer, for $350,000. (Deposition of Edward Landrigan ("Landrigan Dep."), Ex. 13 to Dunn Decl., at 16-17; Ex. 14 to Dunn Decl.) Russo informed Verdura that his client wanted payment by a series of wire transfers over time. (Landrigan Dep. at 23.) The first wire transfer was for $100,000, again to account number 087410 at United Mizrahi Bank, about December 17, 2004. (Ex. 14 to Dunn Decl. at Verdura 2-3.) Another transfer of $60,000, to the same account, quickly followed. (Id. at Verdura 3-4.) Verdura wired $40,000 on January 6, 2005, and $60,000 on January 18, 2005, to the same account. (Id. at Verdura 6-9.) The funds from the $60,000 transfer, however, were returned to Verdura a few days later, and $60,000 was wired to a different account, account number 1161455 at Bank Sarasin in Zurich, Switzerland, because Russo's client had changed the instructions. (Id. at Verdura 9-12; Landrigan Dep. at 34-35.)

At no time did Russo specifically identify the seller on behalf of whom he negotiated these transactions.[6] However, in addition to Reich's admission in her December 21, 2005 letter, there is overwhelming independent evidence that he was acting as an agent for Reich. Davis testified that Russo told him that his client was the same "older woman" each time Russo sold jewelry to Bergeron. (Davis Dep. at 169-70.) It was also shown that Reich had control over the accounts to which the proceeds of the sales were wired. Neeman testified that account numbers 087409 and 087410 at United Mizrahi Bank in London, while nominally held by the Herzog firm, had been opened by Herzog as trust accounts for Reich and were under her control. (Neeman Dep. at 139-41, 150-52, 175-77, 209-11.) Moreover, there were significant transfers between August 2004 and December 2004 from account numbers 087409 and 087410 at United Mizrahi Bank, the accounts into which most of the jewelry transaction proceeds were later deposited, to various entities directly related to Reich. (Ex. 9 to Dunn Decl., at HFN 6238-40)

For example, Neeman testified that he followed Reich's instructions to transfer $30,000 to the Hilton Hotel, Tel Aviv, at Reich's instructions; the transfer came from account number

---

[6] When Russo was asked about the identity of his client during his deposition, he invoked his Fifth Amendment privilege against self-incrimination. (Deposition of Paul Russo ("Russo Dep."), Ex. 8 to Dunn Decl., at 17-45.)

10

087409.  (Neeman Dep. at 177-78; Ex. 9 to Dunn Decl., at HFN 6240.)  There were also transfers totaling $200,000 from account number 087410 to the Sonnenschein firm, which was representing Reich.

Neeman further testified that Herzog opened the account at Bank Winter, the original destination of the payment for the October 13, 2004 sale to Bergeron, as a trust account to pay Reich's then-attorneys in this action.  (Neeman Dep. at 397-400; Ex. 9 to Dunn Decl. at HFN 5808-09.)  Payments were also made from account numbers 087409 and 087410 to Shafran Consulting, an investigative firm Reich hired in connection with this action (Ex. 9 to Dunn Decl. at HFN 6240-41; Neeman Dep. at 178), and from account number 087409 to Fermo Ghezzi, whom Reich described in writing as a "friend"  (Id. at HFN 3395.)  Neeman testified that he met with Ghezzi, at Reich's request, to discuss Reich's business affairs and that the payment to Ghezzi was at Reich's request.  (Neeman Dep. at 87-88, 177-78.)

Finally, Russo's change of instructions to Verdura, whereby funds already wired to United Mizrahi Bank were returned and sent instead to Bank Sarasin in Zurich, came shortly after Neeman informed Reich on or about January 10, 2005, that she could no longer have control of the United Mizrahi Bank accounts because JSC had filed a suit against Herzog, Fox, and Neeman in

11

New York state court. (Neeman Dep. at 34-35, 56-57, 400-01; Ex. 15 to Dunn Decl.)

The evidence establishes that the accounts to which the proceeds of Russo's jewelry transactions were transmitted were under Reich's control. The evidence establishes, and Reich's does not contest, that Reich engaged Russo to sell her jewelry, in clear violation of the Attachment Order, and gave Russo directives about where the payments should be sent. The Court therefore finds that Reich's noncompliance with the Attachment Order has been established by clear and convincing evidence.

**3.**

It is also clear that Reich "'has not diligently attempted to comply in a reasonable manner'" with the Attachment Order. <u>Paramedics Electromedicina</u>, 369 F.3d at 655. As explained above, the first sale of Reich's jewelry took place very shortly after the Attachment Order was signed. On the record before the Court, it is beyond question that repeated sales of Reich's jewelry took place and affirmative evidence indicates that Reich was aware of, and orchestrated, the transactions. The accounts to which payments, other than those made in cash, were wired were under Reich's control, and Reich ordered disbursements from those accounts to pay, among other things, attorneys who represented herself, Jossem, and IDTS in this action. The fact

that Reich was aware that the funds were present in the account and made prompt use of them again indicates that she had knowledge of the transactions from which those funds were derived.

Reich is a sophisticated woman who has conducted business affairs of a very large scope for many years and she has had extensive experience with the legal system; it is impossible to conclude that Reich made a reasonably diligent effort to comply with the Attachment Order. That order specifically provided that "defendant Reich, and all persons acting in concert with her who have notice of this Order, shall not cause or permit the sale, transfer or disposition of any of her assets, whether held in her name or in the name of any other person or entity...." (Attachment Order at 2.) The order also specifically directed that "no person or entity with notice of this Order shall assist defendant to sell, transfer, or dispose of any of her assets, whether held in her name or in the name of any other person or entity." (Id. at 3.) It further provided that "Reich shall forthwith transfer or deliver all of her attachable assets, up to the amount specified in this Order ($200,000,000), to the United States Marshal for the Southern District of New York, such property specifically including (but not limited to)...(c)...jewelry...." (Id.) Reich's actions thus constituted three separate violations: she caused the sale of

her assets; she enlisted Russo to help her "sell, dispose, or transfer...her assets"; and she failed to deliver the jewelry in question to the United States Marshal. Reich simply could not have believed that the sale of her jewelry was in compliance with the Attachment Order. It necessarily follows that she did not make a reasonable effort to comply with that order.[7]

* * *

Reich, in her December 21, 2005 letter to the Court, defends her actions by stating that she defied the Attachment Order so she could continue to pay her attorneys, in the hope that she would not lose all of her remaining property to the plaintiff. This is not a valid defense to civil contempt. The only defenses to civil contempt are that (1) the order allegedly violated is unclear; (2) the party charged with contempt had no knowledge of the order or (3) proof of noncompliance fails to meet the clear and convincing standard of proof. Levin v. Tiber Holding Co., 277 F.3d 243, 251 (2d Cir. 2002) (quoting Sacco v. Burke, 764 F. Supp. 918, 921 (S.D.N.Y. 1991)). In this case, Reich does not argue that the Attachment Order was ambiguous, or that there is insufficient proof of her noncompliance. Indeed,

---

[7] The party moving for a finding of civil contempt need not establish that the violation was willful to satisfy this final requirement. Paramedics Electromedicina, 369 F.3d at 655. Because the Court's finding that Reich did not make a reasonably diligent attempt to comply with the Attachment Order is sufficient to hold her in civil contempt, the Court need not reach the question of whether her noncompliance was willful.

14

as explained above, the Court has concluded that the Attachment Order was not ambiguous and that Reich's noncompliance has been established by clear and convincing evidence. There is also no doubt that Reich had notice of the Attachment Order's existence. Reich therefore has no valid defense to the charge of civil contempt. While unnecessary to a disposition of this motion, it should be noted that Reich never demonstrated that there should be an exception to the Attachment Order for attorneys' fees, because she never demonstrated that she was without other funds. Indeed, the disposition of the jewelry proceeds reflects payments to foreign consultants and the existence of several foreign bank accounts. A true accounting of all of Reich's assets was not possible because she asserted her Fifth Amendment privilege with respect to her financial condition.

Because all three components of the Paramedics Electromedicina test have been satisfied, and no valid defense exists, the Court finds that Reich is in civil contempt. The evidence established that a total of over $780,000, subject to the Attachment Order, was either paid to Reich in cash and not disclosed, or was wired to overseas bank accounts. In order to purge her contempt, Reich must repatriate that amount within twenty (20) days of the date of this Order. Should Reich fail to comply with this directive, JSC may apply for further sanctions, including incarceration, until such time as Reich has

cured her contempt of the Court's Attachment Order. At any hearing for sanctions, Reich could attempt to show her inability to comply with the order to repatriate the funds. However, it would be Reich's burden to establish her inability "clearly, plainly, and unmistakably" to comply. Huber v. Marine Midland Bank, 51 F.3d 5, 10 (2d Cir. 1995).

### III.

JSC also seeks to have Reich sanctioned for criminal contempt. 18 U.S.C. § 401 authorizes a United States Court to "punish by fine or imprisonment, or both, at its discretion, such contempt of its authority ... as ... [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401. To hold a defendant in criminal contempt, it must be proven beyond a reasonable doubt "that (1) the court entered a reasonably specific order; (2) defendant knew of that order; (3) defendant violated that order; and (4) his violation was willful." United States v. Cutler, 58 F.3d 825, 834 (2d Cir. 1995). To establish the final element of willfulness, which, as explained above, need not be shown to hold a person in civil contempt, the criminal contempt must have been committed with "a specific intent to consciously disregard an order of the court." United States v. Lynch, 162 F.3d 732,

735 (2d Cir. 1998) (internal quotation marks and citations omitted).

Pursuant to Rule 42(a) of the Federal Rules of Criminal Procedure, punishment for criminal contempt must take place after "prosecution on notice." Fed. R. Cr. P. 42(a). "The Court must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney." Fed. R. Cr. P. 42(a)(2). The Court must give the alleged contemnor "notice in open court" of the prosecution, and the notice must include "the essential facts constituting the charged criminal contempt." Fed. R. Cr. P. 42(a)(1)(C). The right to a trial by jury is also guaranteed for "serious" criminal contempt allegations potentially resulting in more than six months imprisonment. Int'l Union, United Mine Workers v. Bagwell, 512 U.S. 821, 826-27 (1994); see also Fed. R. Cr. P. 42(a)(3).

On the record before the Court, there is reason to believe that Reich is in criminal contempt of the Attachment Order. The Court therefore refers this matter to the United States Attorney's Office for the Southern District of New York for investigation and, if the United States Attorney deems it appropriate, prosecution.

**CONCLUSION**

For the reasons stated above, the defendant Edith Reich is held in civil contempt of this Court's Attachment Order. Reich is hereby ordered to deliver to the United States Marshal in this district the sum of $785,000 within twenty days of the date of this order. Should Reich fail to comply with this order, the plaintiff may seek additional sanctions for her contempt, including but not limited to imprisonment. This matter is also hereby referred to the United States Attorney for the Southern District of New York for investigation, and possible prosecution for criminal contempt of court.

**SO ORDERED.**

Dated: New York, New York
April 28, 2006

_____
John G. Koeltl
United States District Judge