**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------

**JSC FOREIGN ECONOMIC ASSOCIATION**
**TECHNOSTROYEXPORT,**  03 Civ. 5562 (JGK)(AJP)

        Plaintiff,  **OPINION AND ORDER**

  - against –

**INTERNATIONAL DEVELOPMENT AND TRADE**
**SERVICES, INC., et al.,**

        Defendants.
------------------------------------------------

**JOHN G. KOELTL, District Judge:**

    The plaintiff, JSC Foreign Economic Association Technostroyexport ("JSC"), moves for an order finding defendant Brigitte Jossem ("Jossem") in civil contempt for failure to comply with an order issued by Chief Magistrate Judge Andrew J. Peck on October 7, 2004, sanctioning her for discovery violations pursuant to Rule 37 of the Federal Rules of Civil Procedure.  Magistrate Judge Peck issued a written certification of facts supporting an order of contempt on August 18, 2005. <u>JSC For. Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.</u>, No. 03 Civ. 5562, 2005 WL 1983905 (S.D.N.Y. Aug. 18, 2005) (the "Certification of Facts").

**I.**

Magistrate Judge Peck's Certification of Facts was issued pursuant to 28 U.S.C. § 636(e)(6). That statute provides that a United States Magistrate Judge shall, in a case other than one over which the magistrate judge presides with the consent of the parties under 28 U.S.C. § 636(c) or a misdemeanor case proceeding before the magistrate judge under 18 U.S.C. § 3401, certify facts constituting civil contempt to the district judge. See 28 U.S.C. § 636(e)(6)(A), (e)(6)(B)(iii). The magistrate judge may also issue an order requiring the individual found to have committed the acts in question to show cause before the district court why the individual should not be adjudged in contempt of court. See 28 U.S.C. § 636(e)(6).

Where the magistrate judge has certified facts constituting contempt, the district court must make an independent determination of the facts certified and consider any additional evidence. See 28 U.S.C. § 636(e)(6). The determination of whether the conduct constitutes contempt and, if so, what sanctions are appropriate are left to the discretion of the district court. 28 U.S.C. § 636(e)(6)(B). After a thorough review of the record, this Court concurs with the findings of Magistrate Judge Peck and concurs with his conclusion that Jossem is in civil contempt.

II.

The evidentiary record before the Court establishes the following facts relevant to Jossem's contempt. On September 6, 2005, this Court granted JSC's motion for summary judgment on its claim seeking a declaration that Jossem and her mother, the defendant Edith Reich ("Reich"), were alter egos of the defendant International Trade and Development Services, Inc. ("IDTS"), and thus liable for IDTS's debts. See JSC For. Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 386 F. Supp. 2d 461 (S.D.N.Y. 2005). IDTS's debts include two arbitration awards JSC's predecessor corporation, AOOT Foreign Economic Association (VO) Technostroyexport, obtained against IDTS in 1995. Id. at 466. Those awards had been confirmed by this Court in a judgment dated July 29, 1997, which was affirmed by the United States Court of Appeals for the Second Circuit. See AAOT For. Econ. Ass'n (VO) Technostroyexport v. Int'l Dev. & Trade Servs., Inc., 139 F.3d 980 (2d Cir. 1998).[1]

Prior to obtaining summary judgment on its alter ego claim, JSC had concerns that Jossem was attempting to divest herself of assets in order to frustrate the enforcement of an eventual judgment against her. JSC became aware that, among other

---

[1] In the 1997 action to confirm the arbitration awards, AOOT Foreign Economic Association (VO) Technostroyexport was mistakenly identified in the caption as AAOT Foreign Economic Association (VO) Technostroyexport. JSC, 386 F. Supp. 2d at 470.

3

things, Jossem and Reich had purchased and sold items at the Christie's auction house with regularity since 1993 in their own names or under the name of Burnett Trading, Ltd. Accordingly, JSC's initial request for production of documents in this action, served on October 16, 2003, included a request for the production of "[a]ll documents concerning any purchase or sale by Reich, Jossem or B[u]rnett Trading through Christie's ..." (Pl.'s First Request for Production of Documents, Ex. 7 to Declaration of Tracey A. Tiska dated June 23, 2004, ¶ 58), and all documents sufficient to identify all items "purchased or sold by Reich, Jossem or B[u]rnett Trading through Christie's or Sotheby's" along with documents showing the "disposition of funds received by Reich, Jossem or B[u]rnett Trading for any sale of artwork, jewelry or other item through Christie's or Sotheby's." (Pl.'s First Request for Production of Documents, ¶¶ 92, 94.)

To prevent the disposal of assets that could be seized in satisfaction of an eventual judgment in its favor, JSC later moved for an order of attachment against Jossem. On March 4, 2004, this Court issued an Opinion and Order granting JSC's motion for a prejudgment attachment against the assets of Jossem and defendant Atrium Square, Inc. <u>JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.</u>, 306 F.

4

Supp. 2d 482 (S.D.N.Y. 2004). The order of attachment (the "Attachment Order") was issued on March 13, 2004.

Subsequently, this Court, upon a showing that Jossem was not complying with the Attachment Order, granted JSC's request for an ex parte order authorizing the United States Marshal Service ("USMS") to seize property in Jossem's residences in New York, New York, and Amagansett, New York. On May 11, 2004, while the USMS was effectuating this seizure at Jossem's residence in New York City, JSC's counsel observed a large number of documents relating to transactions at Christie's that, although responsive to JSC's requests for production, had not been produced (collectively, the "Apartment Documents"). A significant amount of litigation took place during the summer of 2004 concerning the production of these documents, with Jossem initially asserting that many of the documents were protected by the attorney-client privilege. Those claims of privilege were later largely abandoned, and the Apartment Documents revealed that Jossem had received $970,000 in four advances from Christie's between January and March 2004. The first of these advances was wired to an account at Mercantile Discount Bank in Israel held in the name of an entity called Patricia, Inc., care of Michael Shine, an Israeli attorney who has represented Jossem and Reich. The remaining three advances were wired to an account at United Mizrahi Bank in London, held by the Israeli

5

law firm of Herzog, Fox and Neeman ("Herzog"), which has also represented Jossem and Reich.

Because Jossem had initially failed to disclose the existence of the Apartment Documents, and had resisted producing them after JSC became aware of their existence, JSC moved before Magistrate Judge Peck for sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure and the court's inherent powers. Magistrate Judge Peck conducted a series of hearings and, on September 21, 2004, found that sanctions against Jossem pursuant to Rule 37 were appropriate. Concluding that the $970,000 paid by Christie's likely would have been subject to the Attachment Order (and therefore not permitted to leave the United States) had Jossem complied with her discovery obligations, Magistrate Judge Peck ordered that "Jossem directly or indirectly ... inform the Court of the whereabouts of the money that went to Israel that is at issue in this motion and the exact details as to where it currently is." (Tr. of Proceedings before Magistrate Judge Peck on Sept. 21, 2004, at 44.) Jossem was ordered to respond to this directive by September 28, 2004, but did not do so.

On October 7, 2004, Magistrate Judge Peck issued an additional order as a discovery sanction, directing Jossem to repatriate the funds transferred to Israel and place the funds in the Marshal's custody under the Attachment Order by October

15, 2004, or she would face contempt charges. (Order of Magistrate Judge Peck dated Oct. 7, 2004 (the "October 7 Order"), Ex. 7 to Declaration of Tracey A. Tiska in Support of Plaintiff's Memorandum Submitted in Connection with Magistrate Judge Peck's Recommendation that Defendant Brigitte Jossem be Sanctioned for Contempt, dated March 3, 2005 ("Tiska Decl.").)

Jossem did not comply with the October 7 Order. Her attorney instead submitted a letter offering to demonstrate, by "provid[ing] the Court with information as to the disbursements of those funds beyond the accounts to which they were initially transferred" in order to establish Jossem's "present inability to comply" with Magistrate Judge Peck's repatriation order. The letter did make clear that the total amount of funds in dispute was $790,000, because the final advance of $180,000 had in fact been repatriated and was in the escrow account of Jossem's lawyer in New York. Jossem's counsel also raised the issue of Jossem's Fifth Amendment privilege against self-incrimination, which she and Reich had invoked since the outset of the litigation. (Letter from Joshua S. Akbar dated Oct. 15, 2004, Ex. 8 to Tiska Decl.) In a Memo Endorsed Order dated October 15, 2004, Magistrate Judge Peck notified Jossem that, if she could not either find someone other than herself or Reich to provide information about what had happened to the expatriated funds, or persuade JSC's counsel to accept the information

7

without a waiver of the Fifth Amendment privilege, she would "have to decide what to do and take [her] chances." (Order of Magistrate Judge Peck dated Oct. 15, 2004, Ex. 9 to Tiska Decl.)

Jossem's attorneys submitted an unsworn letter on October 25, 2004, stating that the expatriated funds had largely been used to pay attorneys in the United States who had represented Jossem and Reich, as well as defaulting entities associated with them, in this action. Funds had also been paid to a Merrill Lynch account in the name of Jerrold Morgulas ("Morgulas"), an attorney and friend of Reich's and Jossem's. Following a response from JSC, Magistrate Judge Peck issued another memo endorsed order on October 26, 2004, requiring Jossem to repatriate the money, or provide direct evidence, such as sworn affidavits or bank records, showing that the funds could not be repatriated, by November 1, 2004. (Order of Magistrate Judge Peck dated Oct. 26, 2004.) Magistrate Judge Peck's order also required that Jossem explain the reasons for the disbursement of the funds out of the overseas accounts to which they had been sent by Christie's. (Id.)

Jossem neither repatriated the money nor offered admissible evidence establishing that she was unable to do so. Rather, on November 1, 2004, her attorneys submitted another unsworn letter asserting that the funds had almost all been disbursed, with the bulk of the funds going to attorneys, including Morgulas.

8

(Letter from David B. Newman dated Nov. 1, 2004, Ex. 13 to Tiska Decl.)  JSC then submitted a letter on November 9, 2004, in which it asserted that Morgulas had testified in his deposition that the Merrill Lynch account in his name, to which $160,000 of the expatriated funds had been paid, had been opened at Reich's behest and was under her total control.  (Letter from David Dunn dated Nov. 9, 2004, Ex. 14 to Tiska Decl.)  In response to this letter, Magistrate Judge Peck gave Jossem an extended deadline of November 15, 2004 either to supply direct evidence that the funds were unavailable or to repatriate the money.  The order warned Jossem that failure to comply could subject Jossem to contempt.  (Order of Magistrate Judge Peck dated Nov. 9, 2004, Ex. 15 to Tiska Decl.)

Jossem, through counsel, then submitted another unsworn letter on November 15, 2004, repeating the representations made in the letters of October 25 and November 1, specifically that the funds from the Christie's advances had been expended. (Letter of David B. Newman dated Nov. 15, 2004, Ex. 16 to Tiska Decl.)  Magistrate Judge Peck issued another order directing that Jossem provide bank statements and records to verify the information in her counsel's November 15, 2004 letter.  (Order of Magistrate Judge Peck dated Nov. 16, 2004, Ex. 17 to Tiska Decl.)

9

On January 3, 2005, Jossem's attorney, Mr. Newman, wrote Magistrate Judge Peck to claim that no information beyond the bank records annexed as exhibits to Mr. Newman's unsworn November 15, 2004 letter was available. (Letter of David B. Newman dated Jan. 3, 2005, Ex. 22 to Tiska Decl.) The January 3 letter asserted that Michael Shine ("Shine") and Yaakov Neeman ("Neeman"), Israeli attorneys who had represented Jossem and Reich, declined to provide further evidence because of Israeli attorney-client privilege. (Id.) It was Shine, Jossem's personal attorney in Israel, who had coordinated the Christie's advances. The first went to Patricia, Inc., care of Shine in Israel, and was shortly thereafter transferred to the general trust account of Shine's law firm. (Certification of Facts, 2005 WL 1983905 at *7.) The second and third advances were wired to an account at United Mizrahi Bank in London held by the Herzog firm, of which Neeman is a partner.

In response to these representations, Magistrate Judge Peck indicated in a memo endorsed order that Jossem should waive confidentiality and produce the bank records documenting her expenditure of the funds advanced by Christie's. (Order of Magistrate Judge Peck dated Jan. 3, 2005, Ex. 23 to Tiska Decl.) Jossem failed to do so and Magistrate Judge Peck gave JSC permission to move for contempt sanctions before this Court.

10

(Order of Magistrate Judge Peck dated Jan. 28, 2005, Ex. 24 to Tiska Decl.)

On March 31, 2005, this Court denied JSC's Order to Show Cause why Jossem should not be held in contempt without prejudice to JSC's seeking a certification of facts for contempt sanctions from Magistrate Judge Peck. (See Tr. of Proceedings Held March 31, 2005, at 41-42; Order dated Apr. 4, 2005.) On August 18, 2005, Magistrate Judge Peck issued the Certification of Facts, concluding that Jossem should be held in contempt. The Magistrate Judge recommended that Jossem be imprisoned unless and until she purged herself of the contempt. He recommended that she could purge herself by (1) returning and placing in escrow the money that was disbursed to the various attorneys or submitting a detailed accounting of the efforts she made to obtain the money and the reasons for her inability to so so, and (2) returning and placing in escrow $104,904.62 that remained in the Morgulas Merrill Lynch account from the second and third Christie's advances, and (3) returning and placing in escrow $3,425 which had not been shown impossible to repatriate. JSC, 2005 WL 1983905 at *12.

After a series of continuances, a hearing was held before this Court on JSC's application on December 9, 2005.

**III.**

"A party may be held in civil contempt for failure to comply with a court order if (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." Paramedics Electromedicina Comercial, LTDA v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 655 (2d Cir. 2004) (internal quotation marks omitted). The imposition of civil contempt sanctions may serve the dual purposes of securing future compliance with court orders and compensating the party that has been wronged, but such sanctions "may not be imposed as a purely punitive measure." Id. at 657; see also Huber v. Marine Midland Bank, 51 F.3d 5, 10 (2d Cir. 1995).

**A.**

The Court agrees with Magistrate Judge Peck's conclusion that the October 7 Order was clear and unambiguous. The order was issued in the form of a memo endorsement on a letter from David Dunn, counsel to JSC, to Magistrate Judge Peck concerning repatriation of funds sent overseas that should have been disclosed pursuant to Jossem's discovery obligations. (Order of Magistrate Judge Peck dated October 7, 2004, Ex. 7 to Tiska Decl.) The directive with which Jossem was directed to comply

12

is found in the final clause of the order: "[A]s a discovery sanction the Court orders Ms. Jossem to repatriate the funds to New York (to be put in the Marshal's custody pursuant to the prior attachment order) by 10/15/04 or face contempt charges." (Id.) No objections were filed with respect to that Order, and no appeal was taken to this Court.

Because the Order was issued on a letter from JSC's counsel relating to the Christie's advances, and followed a lengthy series of hearings and extensive correspondence relating to the appropriate sanction for Jossem's failure to produce the Apartment Documents in response to JSC's discovery requests, it is clear that Magistrate Judge Peck's order referred to the funds that were sent out of the United States in the three Christie's advances not disclosed to JSC.[2] There is therefore nothing ambiguous about Jossem's obligations under the October 7 Order, and correspondence from her attorneys demonstrates that Jossem had no confusion about her obligations under the order. (See Letter from Joshua S. Akbar dated October 15, 2004, Ex. 8 to Tiska Decl.; Letter from David B. Newman dated Oct. 25, 2004, Ex. 10 to Tiska Decl.)

---

[2] The fourth and final advance was in the amount of $180,000 and those funds were repatriated to the United States and were placed in the escrow account of Jossem's attorneys.

13

**B.**

The Court also finds that Jossem's non-compliance with the October 7 Order has been demonstrated by clear and convincing evidence. The October 7 Order specifically directed Jossem to repatriate the funds sent abroad by Christie's in the three advances so that the funds could be held by the Marshal under the Attachment Order. To date, Jossem has not repatriated any funds, nor does she advance any claim to the contrary. This Court finds, as Magistrate Judge Peck concluded, that it is established by clear and convincing evidence that Jossem has repatriated none of the funds advanced by Christie's in the first three advances, in the total amount of $790,000. The second element of civil contempt is therefore satisfied.

**C.**

The final element of a civil contempt finding is that "the contemnor has not diligently attempted to comply in a reasonable manner." Paramedics Electromedicina, 369 F.3d at 655. As the above discussion demonstrates, Jossem made no efforts to repatriate any of the funds from the first three advances from Christie's prior to the argument before this Court, which occurred over fourteen months later. Jossem has instead asserted that the money was disbursed to other parties,

including the above-referenced law firms, and that her compliance with the order is therefore impossible.[3]

While "a party's complete inability...to comply with an order to pay court-imposed monetary sanctions is a defense to a charge of civil contempt," it is also true that "the alleged contemnor bears the burden of producing evidence of [her] inability to comply." Huber, 51 F.3d at 10 (citations omitted). Jossem must therefore show "clearly, plainly, and unmistakably" that repatriation of the funds is impossible. Id.; see also Sec. & Exch. Comm'n v. Zubkis, 97 Civ. 8086 (JGK), 2003 WL 22118978 at *4 (S.D.N.Y. Sept. 11, 2003).

The Court notes that, for some time after the October 7 Order was issued, Jossem did not even make reasonable efforts to produce evidence supporting this defense. Prior to withdrawing, however, Jossem's counsel submitted documentation showing that the Christie's advances went to the accounts in London or Israel, as described above, and were then used mostly to pay various attorneys. Magistrate Judge Peck characterized the transfers as "a transparent attempt at funneling money through overseas accounts to avoid" the Attachment Order. (2005 WL 1983905 at *10) This motion, however, concerns potential

---

[3] Consistent with the text of the October 7 Order, Magistrate Judge Peck has confirmed that his order referred to the specific funds from the first three Christie's advances that were transferred abroad rather than an equivalent amount of money. (Certification of Facts, 2005 WL 1983905 at *9 n.10.)

15

sanctions for Jossem's contempt of the October 7 Order, not the Attachment Order. Magistrate Judge Peck specifically found that the funds paid to Greenberg Traurig, Williams & Connolly, and Esseks Hefter are no longer under Jossem's control and cannot be repatriated unless refunded by those law firms to Jossem. (Id.) Magistrate Judge Peck further concluded that, to purge herself of contempt, "Jossem must use her 'best efforts' to obtain the return" of those funds. (Id.)

According to Magistrate Judge Peck's calculations, which are supported by the evidence submitted by Jossem, $161,068.33 of the first Christie's transfer of $350,000 was paid to Williams & Connolly on January 16, 2004; $7,966.85 was paid to Esseks Hefter on January 21, 2004; and a total of $60,000 was paid to Greenberg Traurig in separate payments on January 7 and January 16, 2004. $229,035.18 of the first advance was therefore paid to those three law firms.

$150,000 was paid from the second advance to Williams & Connolly on February 18, 2004, and $66,527.32 was paid from the third advance to Greenberg Traurig on March 3, 2004. (Id. at *7.) When added to the amounts from the first advance, a total of $445,562.50 was paid to the three law firms identified by Magistrate Judge Peck. Other payments, including $20,000 to Paul Bergman on January 16, 2004, and $60,000 to the Herzog firm

on March 3, 2004, were also documented and Jossem was directed to seek refund of these payments as well. (Id. at *12.)

There were additional transfers of $100,000 on January 16, 2004, $100,000 of February 17, 2004, and $60,000 on March 3, 2004 to the Merrill Lynch account held by Morgulas, which was under the control of Jossem and Reich at all times. Magistrate Judge Peck found that the entirety of the first transfer to this account was used to pay Jossem's bills and is not available, but that only $55,043.38 of the second transfer, plus a $25 transfer fee, was disbursed, and that none of the third transfer was spent other than a $27 transfer fee. As a result, Magistrate Judge Peck concluded that, of the $160,000 represented by the second and third transfers to the Morgulas account, a sum of $44,931.62 from the second transfer and $59,973.00 from the third transfer, were not accounted for and, accordingly, that a total of $104,904.62 must be returned. (Id. at *8-10.) Magistrate Judge Peck also concluded that there was no competent evidence establishing that Jossem could not pay the amount of $3,425 that was listed as "Our Purchase" on the United Mizrahi Bank records on February 20, 2004. (Id. at *8, *10.) Jossem claimed, through counsel, that these funds ware paid to the law firm of Staiger, Schwald, & Sauter (Letter from David B. Newman dated Nov. 15, 2004, Ex. 16 to Tiska Decl., at 3), but has not documented this assertion with admissible evidence.

Although Jossem indicated at the hearing that she would waive her Fifth Amendment privilege against self-incrimination, which she has invoked throughout this case, she ultimately did not do so.  The Court notes that, while the Fifth Amendment precludes drawing adverse inferences against defendants in criminal cases, it "'does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.'"  LiButti v. United States, 107 F.3d 110, 121 (2d Cir. 1997) (quoting Baxter v. Palmigiano, 425 U.S. 308, 318 (1976)); see also id. at 124-25.  Indeed, such an inference "may be given significant weight because silence when one would be expected to speak is a powerful persuader."  LiButti v. United States, 178 F.3d 114, 120 (2d Cir. 1999) (citing United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 153-54 (1923)).  Jossem may therefore be held in contempt if, because of her invocation of the Fifth Amendment privilege, she fails to meet her burden of proving impossibility.  United States v. Rylander, 460 U.S. 752, 758 (1983).

While the contempt application was pending in this Court Jossem did indeed write to the various attorneys and asked them to return the funds.  The law firms did not comply with those requests.  It is unclear what more Jossem could do to require the law firms to return the funds.  These efforts comply with

the Magistrate Judge's suggested means for Jossem to purge her contempt with respect to those funds.

There remains, however, Jossem's failure to return $108,329.62 or to carry her burden to show that she is unable to comply. Because Jossem has neither repatriated the $108,329.62 referred to by Magistrate Judge Peck nor demonstrated that she is unable to do so, this Court finds that she is in contempt of the October 7 Order.

## CONCLUSION

For the reasons explained above, the Court finds that Jossem is in contempt of the October 7 Order. In order to purge herself of contempt, Jossem must promptly repatriate the $108,329.62 identified in Magistrate Judge Peck's Certification of Facts, to be placed in the custody of the United States Marshal in this district pursuant to the Attachment Order. Should Jossem fail to comply with this directive within twenty days, JSC may apply for further sanctions, including incarceration, until such time as Jossem has purged her contempt of the October 7 Order.

**SO ORDERED.**

Dated:  New York, New York
        April 28, 2006

_____
John G. Koeltl
United States District Judge

19